



IN THE UNITED STATES DISTRICT COURT
FOR THE ELEVENTH CIRCUIT
CIVIL DIVISION

**15-cv-80079 Marra/Matthewman**

Michael V. Lombardi
Federal Corrections ~~Institute~~ CENTER
P.O. Box ~~779800~~ 019120
Miami, FL 331~~01~~
   Plaintiff

v.

John Weber III
2510 14th Street, Suite 902
Gulfport, MS 39501
   Defendant

## Complaint

COMES NOW, the plaintiff, Michael V. Lombardi, pro-se, sues John Weber II and alleges:

1. This is an action for damages in excess of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

2. At all times material hereto, the plaintiff, Michael Lombardi (MVL) was a resident of Palm Beach County, Florida.

3. At all times material hereto, the defendant, John Weber III (JW), was and is a resident of Mississippi.

4. At all times material hereto, plaintiff Michael Lombardi was an owner and subcontractor for U.S. Opportunities, LLC, which was a company that supplied temporary workers for various companies throughout the United States, specializing in finding H2B visa workers. They performed the following for an inclusive fee:

a) Made arrangements with various international recruitment agencies who supplied H2B visa workers to meet a particular employers needs.

b) Set up interviews for the customer(s) so they could select qualified H2B visa employees.

c) Assist the customers with the transportation process for various H2B workers to arrive to the customer locations safely (airport pickups only).

d) Assist in providing housing for the H2B visa workers.

e) ~~Refer all legal immigration firms who specialized and provided their~~ expertise, directly with its customers. MVL connected employers directly with immigration firms to handle the signing of all documents, that were ultimately approved by all MVL's customers and signed by them under penalty of perjury.

f) In short, MVL did find temporary international H2B visa workers for employers who qualified for such workers.

WHEREFORE, plaintiff, Michael V. Lombardi demands judgment for damages against defendant John Weber III with interest and costs and demands a trial by jury of all issues triable as of right by jury.

## Case Background

MVL specialized in finding H2B workers for various companies throughout the United States. They performed the following services for an inclusive fee:

1. Made arrangements with various international recruitment agencies who supplied H2B visa workers who were qualified to meet a particular employers needs.

2. Set up interviews for customer(s) so they could select qualified H2B visa workers.

3. Assist the customers with the transportation process for the various H2B workers to arrive to the customer location safely (airport pickups only).

4. Assist in providing housing for the H2B visa workers.

5. Refer all legal immigration matters to immigration firms who specialized and provided that expertise, directly with it's customers. MVL connected the employers directly with immigration firms to handle all the signing of all documents, that were ultimately approved by all MVL's customers and signed by them under penalty of perjury.

6. In short, all MVL did was find temporary international H2B visa workers for employers who qualified for such workers.

7. From the day I met JW, he told me I was going home on probation. He specifically and factually stated how I would surely not go to prison or have to pay restitution. JW was my attorney for a criminal case. Most of all, John Weber told me my case was extremely unique and there were absolutely no cases and/or case law or studies or opinions or anything pertaining to H2B visa workers or visa fraud or legal recruitment fees.

8. I was introduced to JW by my first attorney, Bruce Reinhart, who is located at 250 S. Australian Ave, Suite 1400, West Palm Beach, FL 33401. Mr. Reinhart originally negotiated a 5 month prison sentence for me with Asst. D.A. Annette Williams for me at a camp prison in Miami, Florida. I accepted and Mr. Reinhart factually relayed my acceptance to Annette Williams. However, this all was shattered to pieces when I began to listen to Mr. Weber's constant negligence and unprofessionalism, which at the time, I was blind to.

9. Everything JW ever said to me was a lie that consisted of fraudulent misrepresentations, negligent misrepresentations, as well as breaking every single code of conduct as an attorney. Every move that JW made on my behalf relates directly to incompetence, lack of ethics and unprofessional conduct.

- 2 -

10. JW's misconduct rose to the top, since there are factually several material cases within the FIFTH CIRCUIT, in JW's backyard, that proved my innocence beyond any doubt and still prove it right now today. It is hard to believe that a competent attorney could have not found the cases, unless his sole purpose was to ensure I was incarcerated at all costs. JW's plan of ensuring I would be wrongfully imprisoned was signed, sealed and delivered when he factually and continually thretened and coerced me to sign a plea agreement or he, with the help the prosecutor, would indict my wife for false and fraudulent claims. I was specifically and factually forced to sign a plea agreement by JW. Any man of character would sign anything in order to prevent harm to his family, which is exactly what I did, hence the violation of the substantial rights I have that are guaranteed by the constitution.

11. JW knew I had a solid business and it was flourishing with the future of potential being unlimited. Had it not been for the outrageous and fraudulent conduct of the defendant, I would have become a leader in the industry.

## Legal Arguments

### Count 1 *
### Fraudulent Misrepresentation

12. The four elements of fraudulent misrepresentation are: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false: (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (quoting Johnson v. Davis, 480 So. 2d 265 (Fla. 1985)).

13. In Florida, in order to be actionable, a fraudulent misrepresentation must be of material fact, rather than mere opinion or a misrepresentation of law. Chino Elec, Inc. v. U.S. Fid & Guar. Co., 578 So. 2d 320, 323 (Fla. 3d DCA 1991).

14. This occurred in this case when the defendant made specific and clear false representations of a constitutional magnitude on many occasions, which in turn, had a dramatic negative affect on the plaintiff. Because of these misrepresentations, the prosecutor in the criminal case against the plaintiff, clearly and factually committed prosecutorial misconduct by knowingly and erroneously misleading the court into believing how MVL committed Visa Fraud, Fraud in Foreign Labor Contracting and False statements. Moreover JW's misrepresentations caused an Agent, who swore under oath to the court, to factually commit perjury on several occassions.

15. It was impossible for MVL to commit visa fraud. See the case law that JW had no knowledge of that was in his circuit...U.S. v. Yong Ping Liu, 288 Fed. Appx. 193 (5th Cir. 2008), which states how the visa fraud statute requires a showing that the defendant "knowingly" made or presented a "false statement" in an application, affidavit, or other document. The record and evidence clearly and factually shows how MVL never filed, filled out or signed any type of government document whatsoever. JW specifically and factually told me how this material case did not exist. He could not find one single case within the entire United States.

* PLAINTIFF REALLEGES AND REVEARS PARAGRAPHS 1 THROUGH 11 ABOVE AS FULLY SET FORTH HEREIN AND WOULD FURTHER STATE AS FOLLOWS:

- 3 -

16. It was impossible for MVL to commit fraud in foreign labor contracting. MVL **never** contracted with one single H2B visa worker within the history of the earth's existence. That is not the business MVL was involved with. There is not one single contract that exists between any H2B visa worker, from any country within the world and MVL. MVL factually **never** wrote one single paycheck to any H2B worker. Additionally, no probable cause existed at all whatsoever within the plaintiff's criminal case and a competent attorney should have known that. JW specifically and factually had this knowledge by all the concrete evidence within the discovery process and used none of it that an otherwise competent attorney would have to defend his client. This, again violated the substantial rights I have guaranteed by the constitution.

17. JW knew or should have known that no probable cause existed within the case and how the search warrant's affidavit contained false and fraudulent misrepresentations of a constitutional magnitude, which are specifically proven by the FIFTH CIRCUIT'S case law.

18. It was impossible for MVL to make false statements to any H2B visa worker within the entire world, since MVL did not hire or contract with H2B workers. None of the H2B workers within the fraudulent criminal case against the plaintiff ever had one single communication known to man with me. They do not know me at all.

19. Any fraud perpetuation directly upon the "so called victims" had to have occurred in the Philippines (see exhibit 80) and was beyond the jurisdiction of the court and JW knew this or should have known. Exhibit 80 is an acquittal from the Philippines stating how I am innocent of all charges.

20. The next case that JW could not find to protect my rights is <u>Castellanos-Contreras v. Decatur Hotels, LLC</u>, 662 F.3d, 393, 2010 WL 3816016 (5th Cir. Oct. 1, 2010). The FIFTH CIRCUIT, en banc, ruled in favor of the defendants, holding, as a matter of law, H2B worker's inbound travel, and recruitment expenses are **not** reimbursable under the FLSA. Moreover, the court held that defendant's allege failure to pay visa, travel and **recruitment** expenses are not violations. Again, like <u>Yong Ping Liu</u>, <u>Castellanos</u> proves my innocence and JW could not find this material case. I have been charged with restitution, due to JW's fraudulent misrepresentations. I never collected illegal money to be charged with restitution or any other charge for that matter of fact.

21. In an article named "10 more human trafficking victims arrive in L.A." by Balita Media News Services states several facts that JW knew:

a) Ten more overseas Filipino workers who were petitioned arrived in Los Angeles to join their co-workers who exposed a big case of human trafficking involving a recruiting agency in the Philippines, that sends workers to the U.S.

b) All 10 wrote statements to narrate what happened to each and every one of them.

c) Yaranon, a Filipino worker said he left the Philippines last July 19th with 4 others. He arrived to New York airport, but no one from ARAMARK was there to meet them.

- 4 -

d) Yaranon said they ended up working for Royal Hospitality Services (RH). Their contact person was Arthur Grigoryan.

e) Just like DeGuzman (another Filipino worker), Yaranon said they were supposed to work for ARAMARK at $7.75 per hour.

f) Yaranon said he hired the services of Manila-based Adman Human Resources Placement & Promotions, Inc. Adman collected $6,000 in fees from him.

g) Yaranon & DeGuzman's H2B visa stated that the petitioner was "Aramark Sports LLC" doing business as ARAMARK and valid from 4/1/2010 to 11/30/2010.

h) The same Department of Labor document showed that DeGuzman and Yaranon should have been working in Luray, Virginia.

i) The Philippines Overseas Employment Agency placed adman in a "preventative suspension" status.

22. As noted in the above, as well as the factual exhibit 80, MVL was not involved whatsoever with this alleged crime and JW knew this. The Filipino's who wrote statements pertaining to what happened to them were not part of my discovery and I have never seen those statements ~~until today~~, but I would assume it would say the same as the article. It would say who actually was involved and it was not me. JW knew this fact, as well as there was no probable cause to even question me. Malley v. Briggs, 475 US at 345, 106 S.Ct at 1098 (1986), the officer who applied for the warrant may be liable for violating the constitution if the evidence presented to the magistrate was insufficient to establish probable cause.

23. Another case that JW could not find was Hyder v. Keisler, 506 F.3d 388 (5th Cir. 2007), the international workers committed a crime by deliberately lying to the U.S. Embassy abroad. Dishonesty or lying was an essential element that involved moral turpitude. The H2B workers factually and "knowingly" made or presented a "false statement" in an application affidavit, or other documents and JW knew this, based on Yong Ping Liu. It is a material fact that the H2B workers lied to their own country and the U.S. Embassy to gain entry in to the U.S. to work for an inappropriate employer. They specifically had travel itinerary to the wrong location and factually worked for an inappropriate employer who did not sponsor their visa. Jw knew this.

24. Another case JW could not find is Iqbal v. Hasty, 490 F.3d 143, 147-148 (CA 2 2007), arrested on charges of fraud in relation to identification documents and conspiracy to defraud the U.S., the H2B workers conduct was "consistent with conspiracy." We know the individuals had to lie to their own country and the U.S. Embassy, in order to obtain a valid visa under false pretenses and JW knew this.

25. Not only did JW factually, on several occasions commit fraudulent misrepresentations against me, but he allowed the Agent to commit perjury and the prosecutor ~~to commit prosecutorial misconduct with the sole intention either to obtain~~ an unjust advantage for one part or cause a loss or inconvenience to the other. The result of JW's actions caused permanent and irrepairable damage to the plaintiff.

26. During the sentencing hearing in the criminal case where JW represented me, on August 15, 2012, Agent Elder testified under oath on page 25, lines 2-4 and stated the following:

27. "Yeah there are approximately twenty-something that were in LA and went directly to work from their country straight to the Beau Rivage."

28. Then on page 41, lines 13-14, JW states how he is not questioning the following: "individuals that went to work at the Beau Rivage, and all those individuals should be treated as victims."

29. These people who JW believes are victims are in fact conspirators and JW led the court to believe I was involved. These so called "victims" purchased travel to the completely incorrect destination and worked for an inappropriate employer/sponsor and JW knew this, but he continued to state fraudulent misrepresentations. JW conceded factual issues in dispute and such conduct by counsel failed to hold the government to its burden. U.S. v. Swanson, 943 F.2d 1070 (9th Cir. 1991).

30. In addition, on page 44, lines 14-16 of the 8/15/2012 sentencing transcript, JW has the following testimony: "your honor, we would, we would agree that these 29 individuals that were interviewed all indicated that they sustained the loss, at a minimum, the $5,000 fees." JW does this as if he had an incentive to have me charged with as many victims as possible. JW factually pushed for me to be sentenced at a higher level, when he factually knew about Yong Ping Liu, Castellanos-Contreras, Hyder v. Keisler, and Iqbal v. Hasty. It is a fact that JW agreed to have me charged with restitution for so called "victims" who did not even file a victim statement or report, which would directly mean they do not feel like they are victims.

31. JW ensured I was sentenced based on "materially untrue assumptions and misinformation," U.S. v. Pugliese, 805 F.2d 117, 1123 (2d Cir. 1986).

32. In the article "the case of the 11 trafficked OFWs in Los Angeles" It specifically and factually stated how Adman Human Resources & Promotions, Inc. was ordered to return the amounts of money they collected from the workers, however, JW insisted I pay them these amounts as well for no apparent reason when Castellanos, a FIFTH CIRCUIT ruling of fact, in JW's backyard stated the exact opposite.

33. If JW was a competent attorney and had done his research, he would have found out that these fees were legal to charge H2B workers. On page 39, lines 21-23 of the 8/15/2012 sentencing hearing transcript, JW's testimony states how he agrees with the following: "probation has attached a $5,000 loss, which is reasonable to those individuals that did not, did not make a claim for reimbursement."

34. On page 25, lines 16-19 of the 8/15/2012 sentencing transcript, JW asks leading questions to the Agent in order to have me convicted and given the most prison time possible. He factually was leading the witness against me.

35. JW allowed all orders of forfeiture and/or final orders of forfeiture to be processed even though there is not and was not at the time a nexus between such property and such offenses I was accused of. The property

is **not** and was **not** at the time subject to 18 USC §982 per the factual case law within the FIFTH CIRCUIT and JW knew this.

36. On page 44, lines 8-11 of the 8/15/12 sentencing transcript, the Court has the following testimony: "at this point, according to Mr. Weber I'm not -- that's bad. Mr. Weber indicated to the Court that these people did not make a claim." Under the circumstances, you can determine that the Court, in the beginning, cannot believe how JW is going to allow me to be responsible for individuals/conspirators who didn't make a claim. The Court catches himself and rephrases his statement. It is clear, that the court understands JW's incompetence and how his behavior as an attorney is right on point.

37. The fraudulent misrepresentations that JW presented about me significantly increased my prison sentence and ultimately there was no case, per all the factual evidence, but that did not stop JW. I would be home with my family and would have never been falsely imprisoned if it weren't for JW.

38. On page 13, lines 5-7, Mr. Weber has the following testimony: "his responsibility to Aramark Construction was to prepare the paperwork with the assistance of his lawyers and his immigration team." Lets begin by stating how Aramark is not a construction company. The second issue is with his testimony of false and fraudulent misrepresentations. I have never been responsible for preparing one single immigration document (see Yong Ping Liu). I never in the history of the earth's existence employed an immigration team. I never prepared immigration documents or employed one single employee, which includes any type of immigration employees. The indictment charges against me were impossible and JW knew it.

39. Knowing very well that the Castellanos case existed and how Adman was ordered to return all the money back to the H2B visa workers, JW specifically and factually told me that if I wrote a check to the government for $400,000+, the government would recommend I go to prison for only 18 months.

40. The black and white evidence is clear how it factually shows the fraudulent misrepresentation that JW stated about me. JW succeeded by misleading the court with fraudulent misrepresentations of a constitutional magnitude. He was so inappropriate that the judge could not believe his words as previously stated. Moreover, JW knowingly allowed the government to make an enormous amount of false statements and commit perjury without objection, when factually knowing there was case law to defend me beyond any doubt whatsoever.

40. I suffered, actual substantial damage and the defendants deception and outrageous fraudulent conduct was the proximate cause of my injuries.

41. JW on more than several occasions made a suppression or fraudulent misrepresentation of the truth with the intention either to obtain an unjust advantage for one part or cause a loss or inconvenience to the other. The result of JW's actions caused permanent and irrepairable damage to the plaintiff.

## Count 2
### Tortious Interference with a Contract

Plaintiff, realleges and reavers paragraphs 1 through 11 above as if fully set forth herein and would further state as follows:

- 7 -

42. The plaintiff and his company had contracts throughout the globe. Because of the acts of the defendant, the result was irrepairable harm and damage to the plaintiff.

43. "Tortious interference with a business relationship requires a plaintiff to allege (1) the existence of a business relationship, (2) knowledge of the relationship on the part of the defendant, (3) an intentional and unjustified interference with the relationship, and (4) damage to the plaintiff as a result of the relationship." Cherry v. D.B. Zwirn Speical Opportunities Fund, No. 8:09-CV-33, 2010 US Dist Lexis 6468, 2010 WL 415313, at *8 (M.D. Fla. Jan. 27, 2010), 11th Circuit.

44. "The law requires an existing contractual or business relation with a third party before there can be interference with that relation." Bush v. Goldman Sachs & Co., 544 So. 2d 873, 875 (Ala. 1989); see also Puncy v. Vulcan Materials Co., 920 F. Supp. 1566, 1585 (N.D. Ala. 1996 11th Circuit).

45. By JW's own acts, he willfully and intentionally affected the contractual relationship between all of my global customers. This interference caused irrepairable injury to me. My livelihood was destroyed, as well as being the cause for me being in prison.

46. "The Eleventh Circuit has stated that 'a business relationship need not be evidenced by a contract, but generally require an understanding between the parties that would have been completed had the defendant not interfered.'" E-Z Pack Mfg, LLC v. RDK Truck Sales & Serv., Inc., No. 8:10-CV-1870, 2011 US Dist Lexis 97274, 2011 WL 4343790 at *10 (M.D. Fla. Aug. 10, 2011).

47. That did occur here when the defendant intentionally damaged the spectacular relationship that the plaintiff had with his customers globally, as well as his national and international reputation within the industry. Plaintiff, realleges paragraphs 1 through 11 above as if fully set forth herein and would further state as follows:

### Count 3
### Negligent Misrepresentation

48. Negligence in itself is a flexible term for failure to use ordinary care under the particular factual circumstance revealed by evidence in a lawsuit. It is also conduct which falls below the standard established by law for the protection of other against unreasonable risk of harm. Restatement second of torts §282.

49. The four elements of negligent misrepresentation are: (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation. Baggett v. Electricians Local 915 Credit Union, 620 So. 2d 784, 786 (Fla. 2d DCA 1993).

50. In this instant case, the defendant made numerous and continuous improper misrepresentations that were negligent. This in turn, caused me to be the recipient of the injury received, due to the negligent misrepresentation,

- 8 -

since "the tort of negligent misrepresentation occurs when there is a breach of duty to supply correct information to plaintiff." Doucet LaFourche Parish v. Fire Protection Dist. No. 3, 589 So. 2d 517, 519 (La. Ct. App. 1991).

PLAINTIFF, REALLEGES PARAGRAPHS 1 THROUGH 11 ABOVE AS IF FULLY SET FORTH HEREIN AND WOULD FURTHER STATE AS FOLLOWS:

### Count 4
### Intentional Infliction of Emotional Distress

51. To establish a claim for intentional infliction of emotional distress, a plaintiff must allege that: (1) the defendant acted intentionally or recklessly; (2) the defendant's actions were extreme and outrageous; (3) a casual connection between the wrongful conduct and the emotional distress; and (4) the plaintiff suffered severe emotional distress. Walker v. Bank of AM, N.A., 2014 US Dist. Lexis 3829 (11th Cir. 2014).

52. This is exactly what happened in the instant case. The conduct of the defendant was extreme and outrageous. This is documented by the factual and material exhibits, the testimony by JW and all of the discovery evidence that I have received.

53. These actions directly caused emotional distress to the plaintiff, due to the false and fraudulent misconduct of JW, which caused the plaintiff to do a 51 month prison sentence. This, in turn, shattered his family relationship which not only left him financially without anything, but emotionally as well.

54. This fact is well documented by the Psychology Department at FCI-Miami prison, which had and is currently treating the plaintiff for emotional distress. Because of this he was forced to take medication.

PLAINTIFF, REALLEGES PARAGRAPHS 1 THROUGH 11 ABOVE AS IF FULLY SET FORTH HEREIN AND WOULD FURTHER STATE AS FOLLOWS:

### Count 5
### Tort of Outrage

55. A tort of outrage is a claim for intentional infliction of emotional distress and is detailed in the prior section. However, additionally, "extreme and outrageous conduct is so extreme in degrees to go beyond all possible bound of decency, and to be regarded as atrocious and utterly intolerable in a civil community." Twyman v. Twyman, 855 SW 2d. 619, 621 (Tex 1993). See also Van Duzer v. U.S. Bank Na.

56. That resulted here, when the defendant, through untruthful statements that were so extreme and blatantly false, that the plaintiff's life was destroyed in all matters. He financially lost everything and additionally his personal relationship with his wife and children were completely destroyed as well.

PLAINTIFF, REALLEGES PARAGRAPHS 1 THROUGH 11 ABOVE AS IF FULLY SET FORTH HEREIN AND WOULD FURTHER STATE AS FOLLOWS:

### Count 6
### Defamation

57. The elements of defamation are: (1) publication of the statement; (2) falsity; (3) negligence as to the statement's falsity; (4) actual damages; and (5) the statement must be defamatory. Ward v. Casual Rest. Concepts, Inc., No. 8:10-CV-2540, 2011 US Dist. Lexis 69712, 2011 WL 2600511, at *6 (M.D. Fla. June 29, 2011).

- 9 -

58. A false and unprivileged publication which injures a corporation, prejudices its ability to conduct its trade or business, deters third persons from dealing with it, assails its management, or impugns its method of doing business is actionable per se. See, E.G., McIver v. Tallahassee Democrat, Inc., 489 So. 2d 793, 794 (Fla. 1st DCA 1986); Diplomat Electric v. Westinghouse Electric Supply Co., 378 F.2d 377, 383 (5th Cir. 1967).

59. This occurred in this case when the remarks and actions of the defendant led me to being first criminally indicted and then being convicted to a 51 month prison sentence. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ascroft v. Iqbal, 556 US 662, 129 S.Ct. 1937, 1949, 1732 Ed. 2d. 868 (2009).

Plaintiff, realleges and reavers paragraphs 1 through 11 above as if fully set forth herein and would further state as follows:

### Count 7
### Tortious Interference with Business Relationships

60. The tortious interference with business relationship "occurs when a person unlawfully diverts prospective customers away from one's business." Par Indus., Inc. v. Target Container W., 708 So. 2d 44, 48 (Miss. 1998); See also Cenac v. Murray, 609 So. 2d 1257, 1268. This case explains that tortious interference with a business relationship occurs "when a wrongdoer unlawfully diverts prospective customers away from one's business thereby "encouraging" customers to trade with another."

61. The elements to prove such a claim are: "(1) the acts were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) actual damage and loss resulted." MBF Corp v. Century Bus Commc Ins. Inc., 663 So. 2d 595, 598 (Miss. 1995). Also see, United Brand Inc., v. Tenders, 868 F. Supp. 2d 572 (5th Cir. 2012), as well as PDN, Inc. v. Loring, 843 So. 2d 685, 688 (Miss. 2003).

62. This occurred in this case when JW gave deliberate and fraudulent statements to the district court, which directly impacted me and my family in the worst possible way that is conceivable. It can be proven beyond any doubt that JW is responsible for material fraudulent statements told to the court in order to have me convicted and lose my entire business. These fraudulent statements were the precise reason why I lost all my business relationships globally. The damage he caused is irrepairable.

63. These acts were intentional and willful, since when he made the remarks and put forth his remarks into action, he knew they were false. The acts themselves caused damage to the plaintiff in his lawful business. JW's actions were conducted with unlawful purpose, making material and damaging misstatements and finally actual damage did, in fact result. This was monetary in nature, since all current and future earnings were lost, as well as the plaintiff's business relationships with all his customers globally. Furthermore, his right to liberty was taken away with a 51 month prison sentence and inappropriate restitution. "Words which are actionable in themselves, or per se, necessarily import general damages and need not be pleaded or

- 10 -

proved but are conclusively presumed the result. <u>Bobenhausen v. Casset Ave. Mobile Homes, Inc.</u>, 344 So. 2d at 281 (Fla. 1st DCA 1977).

64. "Similarly, a cause for action for tortious interference with business relations does not accrue until existing negotiations, which are personally certain of resulting in a contract, are interfered with such that the negotiations terminated and harm to the plaintiff results." <u>Hill v. Heritage Resources</u>, 964 SW 2d. 89, 116 (Tex: App-El Paso 1997 pet. denied); <u>Million v. AM Int'l Group, Inc.</u>, 2005 US Dist. Lexis 8864 (5th Cir. 2005).

65. In the instant case, contracts existed with customers throughout the globe, which grew larger through time and this was interfered with, since all my current and future contracts were terminated within the industry. The end result was the entire global business collapsed and caused damage to a reputation that will be impossible to reestablish. My reputation and business are 100% irrepairable, as well as my family life.

PLAINTIFF, REALLEGES AND REVEALS PARAGRAPHS 1 through 11 ABOVE AS IF FULLY SET FORTH HEREIN AND WOULD FURTHER STATE AS FOLLOWS:

### Count 8
### Malice

66. A defendant acts with actual malice if the defamatory statement is made with "knowledge that it was false or with reckless disregard if it was false or not." <u>New York Times Co. v. Sullivan</u>, 376 US 254, 289-290, 84 S.Ct. 710 11 Ed. 2d 686; <u>Wallace v. Perry</u>, 423 B.R. 215 (5th Cir. 2010).

67. Additionally, it should be noted that malice may be proved through either direct or indirect circumstantial evidence. Thus, if a plaintiff proves that the defendant's defamatory statements were made with malice by clear and convincing evidence, a court may impose punitive or exemplary damages." "Evidence is clear and convincing if it supports a firm conviction that the facts to be proved are true." <u>Transportation Insurance Co. v. Mariel</u>, 879 SW 2d. 10, 23 (Tex 1994); see also <u>Wallace v. Perry</u>.

68. That is the case here, since plaintiff can prove with clear and convincing evidence that the defendant's statements, actions and remarks were not only false, but the defendant knew they were false when they made them, which directly affected the plaintiff. The fact is easily documented and shown specifically within the enclosed exhibits and quoted testimony in federal court.

69. JW's actions, which are documented, speak just as loud as his words. There is no doubt whatsoever that his actions were deliberately done and did cause harm to the plaintiff. Since JW is the one who caused the damage, he is responsible for making the plaintiff whole.

### ~~Punitive Damages~~
### ~~Damages~~

70. In computing the amount of damages, many things have to be considered. Monetary damages, which include current earnings, as well as future earnings.

In addition, based on the significance of the permanent and irrepairable harm, punitive damages can also be considered, since the defendant should further be punished for his actions.

71. Any person having suffered injury from defamation is entitled to recover damage. Florida law recognizes two categories of compensatory damages for defamation: general and special. Bobenhausen v. Cassat Ave. Mobile Homes, Inc., 344 So. 2d 279, 281 (Fla. 1st DCA 1997).

72. General damages are those which the law presumes must naturally, proximately and necessarily result from publication of the libel or slander. They are allowable whenever the immediate result is to impair the plaintiff's reputation, although no actual pecuniary loss is demonstrated. 20 Fla. Jur. Libel and slander sections 6, 88. Id. Special damages, on the other hand, "do not result by implication of law," and "it is necessary for a plaintiff to show his special damages proximately resulted from the defamation." Bobenhausen, 344 So. 2d at 281.

73. Compensatory damages are not limited to out-of-pocket loss. Gertz v. Welch, Inc., 418 US 323, 94 S.Ct. 2997, 41 L.Ed. 2d 789 (1974). The injured party may recover damages resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering. Id.

74. "Of course, ... all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." Gertz, 418 US at 349, 94 S. Ct. 2997, 41 L.Ed. 2d 789.

75. There is "considerable flexibility in the form of necessary proof of damages. What money a business would have made but for the interference of another party has to be estimated." Lynn v. Soterra Incorporated, 802 So. 2d 162, 170 (Miss. App. Ct. 2001).

76. Furthermore, in AmSouth Bank v. Gupta, 838 So. 2d 205, 214 (Miss. 2002), addressed the necessity of customer diversion to demonstrate interference with business relations holding that "while the tort has its origin in efforts of a third party directly against a plaintiff's customers, conduct interfering with the plaintiff may suffice."

77. Moreover, the proof in such a case must provide such certainty at the nature of the particular case may permit to "enable the trier of facts to make a fair and reasonable estimate of the amount of damage." Id at 171 (citing Freeman v. Huseman Oil Inter, Inc., 717 So. 2d. 742, 746, (Miss. 1998). Also, "where it is reasonable certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery....the plaintiff will not be denied substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating the loss." Raines v. Bottrell Insurance Agency, Inc., 992 So. 2d 642, 647 (Miss. Ct. App. 2008) (citing Cain v. Mid-South Pump Co., 458 So. 2d 1048, 1050 (Miss. 1984).

78. In fact, in Koehring Company v. Hyde Construction Co., 254 Miss. 214, 178 So. 2d 838, 854 (Miss. 1965), the Mississippi Supreme Court held

- 12 -

"that a party will not be able to escape liability because of lack of perfect measure of damages...." Therefore a reasonable basis for computation and the best evidence, which is obtainable under the circumstances of the case, and which will enable the trier to arrive at a fair approximate estimate of the loss is sufficient proof."

79. In summary, the damages are provable and it is extensive. There was proximate causation and it was foreseeable for without JW's false statements, the plaintiff would not have been indicted or imprisoned. There is no question that because of his false and fraudulent statements is why, in fact, the plaintiff was incarcerated, which caused him to lose his business and permanently damaged his reputation. This is irreparable damage.

80. The plaintiff has direct evidence, which proves the existence of fact without inference or presumption. Morris v. Emory Clinic, Inc.

81. Therefore, plaintiff requests punitive damages as well, since traditionally punitive damages are "awarded in addition to actual damages when the defendant acted with recklessness, malice or deceit," and these damages are viewed as a "way of penalizing the wrongdoer." Cooper Industries v. Leatherman Tool, 532 US 424, 432, 121 S.Ct. 1678, 149 L.Ed 2d 674 (2001).

82. Furthermore, when determining damages, the court cannot forget that "compensatory damages are intended to redress the concrete loss that plaintiff has suffered by reason of the defendant's wrongful conduct. Punitive damages, which have been described as 'quasi-criminal,' operate as 'private fines' intended to punish the defendant and to deter future wrongdoing." See also Schroeder v. Greater New Orleans Credit Union, 2012 US Dist. Lexis 171139 (5th Circuit).

83. Therefore, in summary the plaintiff should be entitled to punitive, as well as compensatory damages.

### Trial by Jury of my Peers

Because of the extensive amount of facts, as well as damages, such like this occurs on a way too often basis, a trial by jury of his peers is what is desired by the plaintiff.

### Conclusion

Based upon all the illegal acts done to the plaintiff, as well as the long and short term effects on his financial condition, the plaintiff hereby requests a settlement in excess of seventy-five thousand ($75,000) dollars, which does not include all litigation costs and attorneys fees.

Respectfully submitted,

Michael V. Lombardi          Date: 1/19/15

## PERJURY STATEMENT

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct and that this was placed in the prison mailing system on ___1/19/15___ (month, date, year).

Executed (signed) on ___1/19/15___ (date).

_____
Michael V. Lombardi
Signature of Plaintiff

Case 9:15-cv-80079-KAM   Document 1   Entered on FLSD Docket 01/23/2015   Page 15 of 15

Mike Lombardi 16314043
FDC-MIAMI
P.O. Box 019120
Miami, FL 33101

LEGAL MAIL

Clerk of the Court
701 Clematis Street, Room 402
West Palm Bch., FL 33401

